Renee M. Finch (NSBN 13118)
MESSNER REEVES LLP
8945 W. Russell Road, Suite 300
Las Vegas, Nevada 89148
Phone: (702) 363-5100
Email: *rfinch@messner.com*

Harry L. Manion, III (admitted *pro hac vice*)
Michael S. Levine (admitted *pro hac vice*)
Christopher Cunio (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Email: *hmanion@huntonak.com*
Email: *ccunio@huntonak.com*
Email: *mlevine@huntonak.com*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CIRCUS CIRCUS LV, LP, | CASE NO.: 2:20-CV-01240-JAD-NJK |
| *Plaintiff*, | **MOTION TO AMEND COMPLAINT** |
| v. | |
| AIG Specialty Insurance Company, | |
| *Defendant*. | |

Plaintiff Circus Circus LV, LP ("Circus Circus") hereby seeks leave to amend its complaint under Fed. R. Civ. P. 15(a)(2) and 16(b)(4), to add claims of bad-faith claims handling by defendant AIG Specialty Insurance Co. ("AIG"). Leave to amend is freely given when justice so requires, and justice so requires here. Recently served discovery responses have revealed, for the first time, alarming facts about the paucity of any "investigation" of Circus Circus's claim.

In fact, documents produced by AIG to Circus Circus in December 2020 reveal:

- AIG used an unlicensed adjuster to purportedly investigate the Claim;

- AIG, in contravention of its own guidelines, directed its adjuster to ask only limited questions designed to elicit particular responses that it believed would support a denial of coverage;

- AIG knew its purported "investigation" would lead to a denial of coverage and engaged experienced coverage counsel within hours of receiving the Claim; and

- After obtaining answers to its purpose-driven questions, AIG shut down its purported "investigation" and told its unlicensed adjuster to "sit tight" despite a rapidly evolving understanding of, among other things, the incubation period for COVID-19, how COVID-19 is transmitted, how COVID-19 utilizes surfaces and indoor air as modes of transmission, causing a physical transformation of that property, and the prevalence of asymptomatic cases and why that prevalence demonstrates damage to property even without a positive COVID-19 diagnosis.

These and other facts contained in AIG's recently produced documents reveal that AIG utterly failed its duty to investigate Circus Circus's claim fairly, objectively, and reasonably. Those facts confirm that AIG acted in bad faith and committed unfair practices. Circus Circus has been harmed by AIG's improper conduct and should be afforded leave to pursue appropriate remedies under Nevada law. There is no undue prejudice to AIG from the amendment, as AIG concealed its misconduct and should rightfully be held accountable for it. There is no undue delay by Circus Circus, which only recently learned of AIG's misconduct. Finally, and importantly, the amendment will have no effect on the pending motion to dismiss, which concerns only issues based on interpretation of the Policy. Leave to amend should be granted.

## BACKGROUND

For ease of reference, the facts are presented in two sections: (I) facts alleged in the original complaint (which are carried through to the amended complaint) and (II) additional facts that support the amendment.

### I. Coverage Under the AIG Policy.[1]

This case arises out of Circus Circus's claim for coverage under an "all risks" insurance policy that AIG sold to Circus Circus ("Policy"). The salient background is set forth in the original complaint and the proposed amended complaint. To summarize: Circus Circus operates a sprawling 2.8 million square foot casino complex situated on over 70 acres of land in Las Vegas, Nevada. The casino complex has more than 1,100 gaming attractions, nearly 3,800 rooms, and more than 2,200 employees. Before the pandemic, more than 5,800 individuals were present at the complex each day.

---

[1] These facts are by way of summary only.

COVID-19 is a deadly communicable disease that has infected more than 25 million people in the United States and caused more than 420,000 deaths here.[2] It spreads through person-to-person transmission and through contact with virus-contaminated objects and surfaces. Infected persons are contagious when they are showing symptoms but also in the period before they show symptoms. Infected persons who are asymptomatic are contagious even though they may not even be aware they are infected. The World Health Organization has declared the outbreak a global pandemic. A federal state of emergency has been declared, as well as a state of emergency in Nevada. Federal, state, and local authorities imposed "Stay at Home Orders" that required "nonessential" businesses to close and residents to remain in their homes unless performing "essential" activities. COVID-19 on-site and these orders have caused and continue to cause partial or total interruption of Circus Circus's business operations. Circus Circus closed its doors at 12:01 AM on March 18 as a direct result of the COVID-19 pandemic. Persons infected with COVID-19 were present at Circus Circus before March 18, 2020, and surfaces of the type on which the virus survives are used throughout Circus Circus's facilities and operations.

Coverage under the AIG Policy is triggered, including the "all risks" coverage. COVID-19 and the Stay at Home Orders are each a "Covered Cause of Loss" under the Policy, and Circus Circus experienced "direct physical loss" of its property from a Covered Cause of Loss beginning at 12:01 AM on March 18, and it experienced "direct physical damage" to its property from a Covered Cause of Loss because COVID-19 causes physical damage to property and because it contaminates objects and surfaces. Other coverages are triggered, as explained in the original Complaint. No exclusion applies, and all conditions precedent have been satisfied.

**II.    AIG's Bad-Faith Claims Handling.**

AIG's recently served discovery responses reveal that AIG conducted a token, result-oriented investigation with a clear plan to deny coverage within hours of receiving Circus Circus's Claim. AIG's answers to interrogatories were served on December 2, 2020, its privilege log was served on December 28, 2020, and a revised privilege log is pending per AIG.

---

[2] https://covid.cdc.gov/covid-data-tracker/ (last visited Jan. 29, 2021).

{04617428 / 1} 3

On March 20, 2020, Circus Circus notified AIG that it had experienced and continued to experience a covered loss as a consequence of the physical loss and damage caused by COVID-19. From that point and up through June 19, 2020, when it denied coverage, AIG conducted no meaningful factual investigation. Instead, it geared up for litigation—none of which was known by Circus Circus until it received AIG's discovery responses.

AIG assigned the claim to Charles Benson, an insurance adjuster unlicensed in Nevada. AIG directed Benson to develop an early record on which AIG could rely to deny coverage; then AIG told Benson to "sit tight." On March 27, 2020, Benson had a telephone conversation with Circus Circus general counsel Brad Anthony. Benson apparently failed to memorialize the substance of the conversation. AIG Senior Complex Director Joseph C. Price, who was directing Benson, notes in *his* claim log several days later that Anthony indicated that he did not know whether Circus Circus's property had suffered any damage as a result of COVID-19.

On April 1, 2020, Price directed Benson to ask Circus Circus six specific questions:

> (1) Have any employees or staff working for Circus Circus been diagnosed with Covid-19?
>
> —if so, when? How many? What areas did they work in?
>
> (2) Have any guests and/or customers notified you that they have been diagnosed with Covid-19 before or after having been on premises?
>
> —if so when? How many? Did they stay in the hotel or just visit the casino?
>
> (3) Do you have any policies, memos, guidelines or updates/alerts/ directives sent to employees about Covid 19? (Please provide)
>
> —have you asked employees to contact you if they are diagnosed with Covid 19?
>
> (4) Are staff, independent contractors (security) or other personnel on site working at the facility? What purpose? (please provide detail)
>
> (5) Were there any guest rooms, areas of the hotel or casino, that were closed due to actual presence of Covid 19 and were those portions of the buildings required cleaning to disinfect?
>
> —if so, how long did it take to clean that area?
>
> (6) To your knowledge, were any no [*sic*] nearby hotel, casinos or buildings to Circus Circus closed due to the actual presence of Covid 19 which required a cleaning to disinfect?

1  This was the extent of Benson's factual investigation.

2  Two days later, on April 8, 2020, and only three weeks after the closure and still in the very early days of the pandemic, Anthony provided information in response to Benson's questions. Anthony responded based on information *then available*. Anthony is not an insurance professional and, as AIG knew, Circus Circus had no sophisticated in-house insurance personnel. Nor is Anthony expert in infectious disease.

Based on the limited information available to him at the time, Anthony indicated "NO, not to our knowledge" in response to Benson's first and second questions about whether employees, staff, or guests had been diagnosed with COVID-19. He likewise indicated "NO" to the fifth question about the actual presence of COVID-19. At the time, there was no feasible way for Circus Circus to test individuals for active COVID-19 infection because antigen tests were not available, and PCR tests were generally utilized by health care institutions only—a fact that AIG undoubtedly knew when it asked these questions.  Moreover, there was (and still is) no practical way for Circus Circus to test for the presence of COVID-19 on the surfaces and indoor air across its entire property—another fact that AIG was undoubtedly aware of.

Benson used Anthony's responses to prepare his initial report to AIG on April 10, 2020. Benson conducted no other investigation of the basis for the claimed loss. Yet, on April 15, 2020, Price sent a reservation of rights letter to Circus Circus stating that "based on the information developed to date" certain provisions of the Policy "may bar or limit" coverage.

From that point forward, AIG did absolutely nothing to further investigate the claim, despite the rapidly evolving knowledge and information about COVID-19 and how it causes a physical transformation of property to an unsafe, hazardous and potentially deadly instrument of transmission. For instance, AIG:

- Failed to visit Circus Circus;
- Failed to interview any of Circus Circus's 2,200 employees;
- Failed to contact any of Circus Circus's 337,000 guests from the period preceding its closure (January 1, 2020, to March 18, 2020);
- Failed to follow up with Circus Circus about testing the property *after* tests became commercially available;

{04617428 / 1} 5

- Failed to provide direction or instruction to Circus Circus about how it could document the damage caused by COVID-19;

- Failed to consider or simply ignored publicly available information about the manner by which COVID-19 physically affects property;

- Failed to establish objective criteria for the presence of COVID-19 and damage caused by its presence; and

- Failed to hire experts to determine the cause and origin of the damage to Circus Circus's property.

Even more alarming, AIG apparently deliberately blocked its "independent adjuster" from doing anything further to investigate. Benson asked Price on April 22 and again on April 29 whether there was "anything further you would like me to do on this one at the moment." Price told him on the 29th: "Sit tight until you hear further from me." He asked about engaging a forensic accountant, but Price demurred. On April 30, Price wrote to say that he was reviewing Benson's initial report with the preliminary details of the claim "to determine what, if any, additional investigation is recommended to complete our analysis." Two weeks later, Benson again wrote to ask Price whether he should do anything: "[I]f you need me to reach out to the insured, let me know." Benson would send Price two more reports, each materially the same as the initial report because he conducted no factual investigation.

Meanwhile, as it was shutting down its token investigation of Circus Circus's claim, AIG aggressively engaged coverage counsel. On March 26, 2020, after receiving a one-sentence email from Circus Circus's broker notifying the insurer of the Claim and before even speaking with Circus Circus, AIG retained experienced coverage counsel.

AIG's recently served answers to interrogatories (served December 2, 2020) state under oath that its coverage denial was based solely on the preliminary details of the claim that it received on April 8 in response to its own narrowly focused and leading questions. In light of that response and the facts summarized above, AIG has acted in bad faith. Circus Circus should be granted leave to hold AIG accountable.

# ARGUMENT

When a party moves to amend its pleading after the deadline set forth in the scheduling order, the Court applies a two-step process: First, the Court determines whether to amend the scheduling order under the "good cause" standard of Fed. R. Civ. P. 16(b)(4), a standard that "primarily considers the diligence of the party seeking the amendment." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992). If good cause is shown, the Court determines whether amendment is proper under Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) provides that the Court should give leave to amend "freely" when justice so requires, a policy that is applied with "extreme liberality." Brown v. Stored Value Cards, Inc., 953 F.3d 567, 574 (9th Cir. 2020) (quoting Moss v. U.S. Secret Serv., 572 F.3d 962, 972 (9th Cir. 2009)). The Court evaluates five factors to determine whether to grant leave to amend: undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility. Id. The fourth factor, undue prejudice, carries the most weight. Id.; Eminence Cap., LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

Good cause exists here, and each of the Rule 15(a)(2) factors supports amendment in this case.

**I.   The Amendments Are Based on Discovery Responses Recently Served.**

Good cause for amendment exists here, and there was no undue delay or bad faith by Circus Circus, because amendment is based on AIG's discovery responses only recently served.

The original complaint was filed on July 2, 2020, and AIG moved to dismiss on August 18. The parties conducted a discovery conference on September 18, 2020, and submitted a Joint Discovery Plan and Scheduling Order on October 2, 2020. ECF 32 at 1. The Court granted the order on October 5. ECF 34. Circus Circus served interrogatories and requests for documents on October 30, and AIG responded on December 2 with the written interrogatory answers and responses to document requests, and it produced its first set of documents. AIG produced additional documents, including its claims-handling procedures, on December 28, and it produced its privilege log on December 28 as well. An updated privilege log is pending per AIG. An Order extending fact discovery through May 14, 2021, was recently allowed (DN. 58).

Circus Circus seeks to amend based on this discovery that AIG only recently answered. In its December 2, 2020, answers to interrogatories, AIG states under oath that its June 19 denial of coverage was based on the preliminary information that it took from its token investigation. The documents that AIG produced, including the claim logs of Benson (the adjuster) and Price (at AIG) confirm that AIG performed no reasonable investigation and had a clear plan to deny coverage at the outset. It assigned the claim to an unlicensed insurance adjuster, directed him to develop an early record on which AIG could deny coverage, and then told him to "sit tight" and do nothing more. And nothing more was done: AIG <u>did not</u> visit Circus Circus, did not interview Circus Circus's employees, <u>did not</u> contact any guest, and <u>did not</u> seek to utilize testing for individuals for COVID-19 when they became available, develop objective criteria to determine COVID-19's presence or the damage it caused, or provide direction or guidance to Circus Circus about documenting that damage.

The claims-handling manuals (produced on December 28) show that AIG was acting contrary to its own written protocols. And the privilege log (also produced December 28) shows that AIG was preparing for litigation before it even spoke with its insured, Circus Circus. None of this was known to, or knowable by, Circus Circus until AIG made its productions. See <u>Drummer v. Alpha Team Constr. Corp.</u>, No. 218CV01251RFBNJK, 2019 WL 2518446, at *2 (D. Nev. June 17, 2019) (granting leave to amend five months after amendment deadline where plaintiff did not obtain relevant information until three weeks before filing of motion to amend); <u>Acosta v. Wellfleet Commc'ns, LLC</u>, No. 216CV02353GMNGWF, 2019 WL 1284100, at *2-3 (D. Nev. Mar. 19, 2019) (leave to amend granted where before amendment deadline plaintiff sought documents that revealed cause to amend and diligently sought amendment after receiving and analyzing documents); <u>Zambrano v. Cardenas Mkts., Inc.</u>, No. 216CV01659GMNNJK, 2016 WL 7045710, at *2 (D. Nev. Dec. 2, 2016) (leave to amend granted where plaintiff sought leave within a few weeks after plaintiff obtained important documents previously unavailable to her). Contrast <u>Lampley v. Smith's Food & Drug Ctrs., Inc.</u>, No. 215CV01289RFBNJK, 2016 WL 5219640, at *3 (D. Nev. July 19, 2016) (recommending denial of leave to amend where plaintiff admitted it could have amended before deadline but made strategic decision to delay seeking leave).

## II. There Is No Prejudice to AIG.

The party opposing amendment has the burden of showing prejudice. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir. 1987). AIG has no cause to complain. The amendments are based on AIG's own bad conduct, which it only recently was forced to reveal. Circus Circus will not need to serve additional discovery, as the discovery it already served covers the claim file and AIG's claim process. No depositions have gone forward; in fact, none are even scheduled until March 15. Circus Circus has already disclosed a bad-faith expert in anticipation of this Motion, and AIG has until February 11, 2021, to submit a rebuttal report. Fact discovery does not close now until May 14.

Importantly, the amendments will have no effect on the pending motion to dismiss, as there is no change to the existing allegations or counts. The amendment simply adds two counts, one for common-law bad faith and one for statutory unfair practices, and supporting allegations.

## III. Amendment Is Not Futile.

Nevada common law and the Nevada Unfair Claims Practices Act, Nev. Rev. Stat. 686A.310, require a diligent and fair investigation of Circus Circus's claim under the terms of the Policy. This AIG failed to do, and AIG is liable for this failure.

Nevada recognizes the implied covenant of good faith and fair dealing in every contract, including insurance contracts. Pemberton v. Farmers Ins. Exch., 858 P.2d 380, 382 (Nev. 1993). "An insurer fails to act in good faith when it refuses 'without proper cause' to compensate the insured for a loss covered by the policy." Id. (quoting U.S. Fid. & Guar. Co. v. Peterson, 540 P.2d 1070, 1071 (Nev. 1975)). Breach of the implied covenant gives rise to the tort of bad faith. Guar. Nat'l Ins. Co. v. Potter, 912 P.2d 267, 272 (Nev. 1996). Bad faith is "an actual or implied awareness of the absence of a reasonable basis for denying benefits of the [insurance] policy." Allstate Ins. Co. v. Miller, 212 P.3d 318, 324 (Nev. 2009) (quoting Am. Excess Ins. Co. v. MGM, 729 P.2d 1352, 1354-55 (Nev. 1986)). This is because the insurer–insured relationship is a special relationship, "similar to a fiduciary relationship." Id. at 326. While the insurer need not place the insured's interests over the company's interests, "the nature of the relationship requires that the insurer adequately protect the insured's interest." Id. At a minimum, the insurer "must equally consider the insured's interests and its own."

1  Id. The insurer has assumed the duty to deal with its insured fairly. Albert H. Wohlers & Co. v. Bartgis, 969 P.2d 949, 956 (Nev. 1998), as amended (Nev. Feb. 19, 1999).

The insurer breaches the implied covenant and commits bad faith when it conducts a grossly inadequate factual investigation. AIG had a duty to investigate Circus Circus's claim. This duty implies the duty to do so fairly, reasonably, and objectively. "Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." Potter, supra. "Tactics such as an unreasonable failure to investigate and unreasonable delay can give rise to an inference of bad faith." Sierzega v. Country Preferred Ins. Co., 650 F. App'x 388, 389 (9th Cir. 2016); Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1013 (9th Cir. 2007) ("The Nevada Supreme Court recognizes biased investigations and misrepresentation of policy terms as evidence of bad faith."); Powers v. United Servs. Auto. Ass'n, 962 P.2d 596, 604 (Nev. 1998), opinion modified on denial of reh'g, 979 P.2d 1286 (Nev. 1999) (affirming bad-faith verdict where "[e]xperts in investigations management testified that [insurer's] investigation was improper, incomplete, poorly done, in violation of [insurer's] own procedures" and amounted to bad faith, and evidence showed insurer failed "to review the evidence objectively" and, had it undertaken "objective investigation," insurer would have discovered evidence to show claim should be paid); Farmers Home Mut. Ins. Co. v. Fiscus, 725 P.2d 234, 236 (Nev. 1986) (affirming liability for breach of implied covenant for, inter alia, "unprofessional claims investigative procedures"); see 14A S. Plitt et al., Couch on Insurance § 205:25 (3d ed. Dec. 2020 update) ("Implicit in the duty to investigate is the requirement that the investigation be adequate and fair. Adequacy and fairness means that the insurer has a duty to diligently search for evidence which supports the insured's claim and not merely seek evidence upholding its own interests.").

> An insurer confronted with a claim owes its insured a duty to investigate the claim fully and fairly. An investigation in good faith requires an honest attempt to discover the answers to questions that have been raised, in a timely manner. The insurer is required to investigate a claim objectively, not simply in order to prove that there is no coverage. Thus, an insurer can not jump to a conclusion on the basis of particular or certain evidence, and then perform a perfunctory investigation. Thus, an insurer has a duty to diligently search for evidence that supports the insured's claim, and not merely seek evidence upholding its own interests. An insurer therefore has a duty

>to investigate all relevant facts relating to a claim, as well questions of law, including any question relating to the interpretation of the policy itself, and relevant statutes and judicial decisions.

M.G. Leary, Defense of a First-Party Bad Faith Claim Action Against an Insurer, 97 Am. Jur. Trials 211, § 4 (updated Dec. 2020) (footnotes omitted); see D. Polin, Insurer's Failure to Investigate Claim in Good Faith, 46 Am. Jur. Proof of Facts 3d 389 (updated Dec. 2020).

That is exactly what occurred here. Circus Circus presented AIG with a claim. The burden and duty were on AIG to determine whether that claim fell within the scope of the Policy. AIG acted unreasonably by failing to conduct any reasonable investigation into Circus Circus's claim, telling its adjuster to "sit tight" and not do anything further to investigate the claim. Instead, it relied on answers to limited questions that were designed to support only a denial of coverage. AIG then shut down its "investigation," ignoring the rapidly developing understanding of COVID-19, including its incubation period; its modes of transmission and the fact that, in addition to person-to-person transmission it also spreads by surface-to-person transmission; how it causes a physical transformation of property; and how the prevalence of asymptomatic and pre-symptomatic cases shows damage to property even without a positive COVID-19 diagnosis. But AIG froze its investigation as of April 8 and went no further.

The same conduct also gives rise to liability for unfair practices under Nev. Rev. Stat. § 686A.310. Specifically, the statute provides that it is an unfair practice for the insurer to fail "to adopt <u>and implement</u> reasonable standards for the prompt investigation and processing of claims arising under insurance policies." Nev. Rev. Stat. § 686A.310(1)(c) (emphasis added). AIG either had no reasonable standards or failed to implement them. The conduct also violates subsection 1(e), which defines it to be an unfair practice for the insurer to fail "to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear." Nev. Rev. Stat. § 686A.310(1)(e). See <u>Thompson v. Allstate Ins. Co.</u>, 431 F. Supp. 3d 1163, 1172 (D. Nev. 2019) (denying summary judgment under subsection 1(e) based on unreasonable investigation); <u>Walker v. Geico Cas. Co.</u>, No. 2:19-CV-0909-KJD-NJK, 2019 WL 6729315, at *5 (D. Nev. Dec. 11, 2019) (denying motion to dismiss where complaint alleged unreasonable investigatory practices; both

subsection 1(c) and 1(e) "protect an insured against unreasonable or unnecessary delays in the claims-settlement process").

## CONCLUSION

Recently disclosed facts show that AIG failed to satisfy its duty to investigate Circus Circus's claim fairly, objectively, and reasonably. Instead, AIG acted in bad faith and committed unfair practices. It should be held to account.

For the reasons set forth above, the Court should grant Circus Circus's request for leave to amend its complaint. In accordance with LR 15-1(a), a proposed Amended Complaint is attached hereto as Exhibit A.

Date:  January 29, 2021.

Respectfully submitted,

CIRCUS CIRCUS LV, LP

By and through its attorneys,

*/s/ Renee M. Finch*
Renee M. Finch
Nevada State Bar 13118
MESSNER REEVES LLP
8945 W. Russell Road, Suite 300
Las Vegas, NV  89148
Phone:  (702) 363-5100
Email: rfinch@messner.com

Michael S. Levine*
*mlevine@huntonak.com*
Harry L. Manion III*
*hmanion@huntonak*.com
Christopher J. Cunio*
*ccunio@huntonak.com*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
Phone:  (202) 955-1500

**Attorneys for Plaintiff, Circus Circus LV, LP**
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

By the undersigned signature, I hereby certify on behalf of the above-captioned plaintiff that on January 29, 2021, a true and correct copy **MOTION TO AMEND COMPLAINT** was electronically filed with the Clerk of Court via the Court's CM/ECF System and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Renee M. Finch*
Renee M. Finch