# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Circus Circus LV, LP,

      Plaintiff

v.

AIG Specialty Insurance Company,

      Defendant

Case No.: 2:20-cv-01240-JAD-NJK

**Order Granting Defendant's Motion to Dismiss, Denying its Motion for Leave to File Supplemental Authority, and Granting Plaintiff's Motion for Leave to Amend**

[ECF Nos. 17, 54, 62]

      Circus Circus sues AIG Specialty Insurance Company for failing to provide coverage for economic losses it incurred from the government-mandated closure of its casino during the COVID-19 pandemic.[1]  AIG moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Circus Circus's "all risks" policy does not cover its claims and any alleged damage caused by the SARS-CoV-2 virus is precluded by its pollutants-or-contaminants exclusion.[2]  Due to the nationwide prevalence of these suits, AIG also seeks leave to file supplemental authority for my consideration.[3]  Circus Circus maintains that it has sufficiently alleged coverage under its policy, and seeks leave to amend to add additional claims for breach of the implied covenant of good faith and fair dealing and violations of Nevada law.[4]

      I find that AIG's additional filing does not aid my decision in this case because AIG provides no additional, controlling precedent, so I deny its motion for leave to file supplemental authority.  Because Circus Circus does not and cannot allege direct physical loss or damage—to

---

[1] ECF No. 1 (complaint).

[2] ECF No. 17 (motion to dismiss).

[3] ECF No. 54 (motion for leave to file supplemental authority).

[4] ECF No. 62 (motion for leave to amend).

its property or others'—sufficient to trigger coverage under its insurance policy, I grant AIG's motion and dismiss those claims with prejudice. But I grant Circus Circus leave to amend to add claims for violations of NRS 686A.310(1)(c).

### Background[5]

At midnight on March 17, 2020, Nevada's Governor Steve Sisolak ordered the cessation of all gaming activities in the state to prevent the spread of SARS-CoV-2, the virus responsible for the COVID-19 pandemic.[6] So Circus Circus folded up the big top, closing its casino doors to comply with the governor's order.[7] For the next few months, Circus Circus's gambling floor remained closed, depriving its thousands of patrons of the opportunity to enjoy its 1,100 gaming attractions.[8] In light of the losses sustained by this closure, Circus Circus requested insurance coverage from its provider, AIG.[9]

Circus Circus's policy provides coverage for "all risks of direct physical loss or damage" to its property "from a [c]overed [c]ause of [l]oss."[10] A covered cause of loss is defined as "a peril or other type of loss, not otherwise excluded" by the policy.[11] But coverage is subject to terms and conditions, including coverage and exclusion provisions, that limit the "physical loss or damage" from which Circus Circus could recover from AIG. Notably, the time-element-coverage provision covers:

---

[5] This is merely a summary of facts alleged in the complaint and should not be construed as findings of fact.

[6] ECF No. 1, ¶¶ 38–39.

[7] *Id.* at ¶ 40.

[8] *Id.* at ¶ 8; ECF No. 26 at 17.

[9] ECF No. 1, ¶¶ 36, 45.

[10] *Id.* at ¶ 47; ECF No. 2-1 (policy).

[11] ECF No. 2-1 at 43.

> [A]ctual loss of income sustained by the Insured during the necessary partial or total interruption of the Insured's business operations . . . during the Period of Interruption directly resulting from a Covered Cause of Loss[.]  In determining the amount payable under this coverage, the Period of Interruption shall be: The period from the time of direct physical loss or damage from a Covered Cause of Loss to . . . the time when . . . normal operations resume; or [] physically damaged buildings and equipment could be repaired or replaced[.][12]

Subject to the conditions of the time-element-coverage provision, and its "direct physical loss or damage" requirement, the policy also provides additional time-element coverages, including:

> **Contingent Time Element [Coverage.]**  If direct physical loss or damage to property of the type insured under this Policy of a direct supplier or direct customer of the Insured is damaged by a Covered Cause of Loss . . . then this Policy is extended to cover the actual loss of income and extra expense sustained by the Insured during the Period of Interruption with respect to such property of the supplier that sustains such loss or damage[.]

> **Extra Expense [Coverage.]**  This Policy is extended to cover the loss sustained by the Insured for Extra Expense during the Period of Interruption resulting from direct physical loss or damage by a Covered Cause of Loss to Insured Property[.]

> **Ingress & Egress [Coverage.]**  This Policy is extended to cover the actual loss of income and extra expense sustained during the period of time when partial or total physical ingress to or egress from the Insured's real or personal property is prohibited as a direct result of a Covered Cause of Loss to property of others[.]

> **Interruption by Civil or Military Authority [Coverage.]**  This policy is extended to cover the actual loss of income and Extra Expense sustained during the period of time when an order of civil or military authority prohibits total or partial access to the Insured's real or personal property, provided such order is a direct result of a Covered Cause of Loss to property of others and such property of others is within [a certain] distance[.][13]

---

[12] *Id.* at 26–27.

[13] *Id.* at 28–29.

The policy also excludes coverage for:

> The actual, alleged[,] or threatened release, discharge, escape[,] or dispersal of Pollutants or Contaminants, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any Covered Cause of Loss under this Policy . . . .
>
> Pollutants or Contaminants means any solid, liquid, gaseous[,] or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals[,] and waste, which after its release can cause or threaten damage to health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property issued hereunder, including, but not limited to, bacteria, **virus**, or hazardous substances . . . .[14]

Circus Circus submitted its claim to AIG on March 20, 2020, citing physical loss and damage caused by COVID-19, which had sickened its employees and "contaminat[ed] objects and surfaces."[15]  After AIG denied the casino's claim on June 19, 2020, Circus Circus sued, seeking declaratory relief and breach-of-contract remedies.[16]  AIG moves to dismiss Circus Circus's complaint, largely arguing that the policy does not provide coverage for the casino's purely economic losses.[17]  It also seeks leave to file additional, supplemental authority in support of its position.[18]  Circus Circus opposes both motions and seeks leave to amend its complaint to add factual support for two additional causes of action—breach of the implied covenant of good faith and fair dealing and violations of Nevada Revised Statute 686A.310(1)(c), (e).[19]

---

[14] *Id.* at 20, 49 (emphasis added).

[15] ECF No. 1, ¶¶ 42, 45, 54.

[16] *See generally id.*

[17] ECF No. 17.

[18] ECF No. 54.  I granted AIG's first motion seeking leave to file supplemental authority on November 23, 2020.  ECF No. 41.

[19] ECF Nos. 26, 59, 62.

**Discussion**

**I.      Motion to dismiss [ECF No. 17]**

Under Nevada law, an insurer "bears a duty to defend its insured whenever it ascertains facts [that] give rise to the potential of liability under the policy."[20]  While all doubts as to coverage are "resolved in favor of the insured," the "duty to defend is not absolute."[21]  "A potential for coverage only exists when there is arguable or possible coverage" and "[d]etermining whether an insurer owes a duty to defend is achieved by comparing the allegations of the complaint with the terms of the policy."[22]  Interpreting insurance contract terms in Nevada is normally a job for the court.[23]

**A.      Circus Circus fails to plausibly allege direct physical loss or damage.**

Circus Circus's policy requires it to show its own or a neighboring business's "direct physical loss or damage" to receive coverage under any of the cited policy provisions.[24]  The casino correctly notes that the terms "direct physical loss or damage" are undefined, and it argues that the losses it incurred by closing its gaming floor fall within a reasonable interpretation of that provision and that other courts have construed similar policies to support coverage.  An insurance policy "is enforced according to its terms to effectuate the parties' intent,"[25] viewing its provisions "in their plain, ordinary[,] and popular sense."[26]  In Nevada, any limitation in

---

[20] *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (Nev. 2004).

[21] *Id.*

[22] *Id.*

[23] *See Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014).

[24] ECF No. 2-1.

[25] *Burrows v. Progressive Cas. Ins.*, 820 P.2d 748, 749 (Nev. 1991).

[26] *Siggelkow v. Phoenix Ins. Co.*, 846 P.2d 303, 304 (Nev. 1993) (citing *Nat'l Union Fire Ins. Co. v. Reno's Exec. Air*, 682 P.2d 1380, 1382 (Nev. 1984)).

policy coverage must "clearly and distinctly communicate[] to the insured the nature of the limitation."[27]  "To determine whether a term is ambiguous, it should not be viewed standing alone, but rather in conjunction with the policy as a whole 'in order to give a reasonable and harmonious meaning and effect to all its provisions.'"[28]

　　　　While neither party identifies controlling Nevada authority that has explicitly interpreted the term "direct physical loss or damage," the Nevada Supreme Court has generally cabined claims for coverage under similar policies to plaintiffs who allege some sort of structural or physical change to a property, which actually altered its functionality or use.[29]  The Ninth Circuit has agreed with such a reading, upholding both an exclusion of coverage under a "direct physical loss or damage" provision when the "record reveal[ed] that there was no damage caused by the fire;"[30] and affirming dismissal of "intangible" claims under a policy's "direct physical loss" provision.[31]  California courts, which often guide Nevada's, have consistently interpreted "direct physical loss" to require a "distinct, demonstrable, physical alteration of the property" or a "physical change in the condition of the property."[32]  This requirement is no less true in the context of the SARS-CoV-2 pandemic, where a growing number of courts across the country,

---

[27] *Reno's Exec. Air*, 682 P.2d at 1382.

[28] *Fourth St. Place v. Travelers Indem. Co.*, 270 P.3d 1235, 1239 (Nev. 2011).

[29] *See Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281, 1283 (Nev. 2014) (describing "electrical problems at a plastic bag manufacturing plant [that] led to damaged machinery and an increased number of defective bags being produced"); *Farmers Home Mut. Ins. Co. v. Fiscus*, 725 P.2d 234, 236 (Nev. 1986) (upholding coverage determination under a "physical loss" provision for damages to a home caused by flooding "from disconnected water supply pipes").

[30] *Commonwealth Enters. v. Liberty Mut. Ins. Co.*, 101 F.3d 705 (table) (9th Cir. 1996).

[31] *Sentience Studio, LLC v. Travelers Ins. Co.*, 102 F. App'x 77, 81 (9th Cir. 2004) (unpublished).

[32] *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 771, 779–80 (2010) (internal quotation marks and citations omitted).

1 including this one, have reasoned that pure, economic losses caused by COVID-19 closures do

2 not trigger policy coverage predicated on "direct physical loss or damage."[33]

3         Recognizing the weight of this authority, Circus Circus attempts to factually and legally

4 distinguish its case, juggling arguments that (1) it has alleged multiple instances of physical

5 damage to its premises and (2) "direct physical loss" under the policy reasonably encompasses

6 temporary "loss of use."[34]  With respect to its first argument, the complaint comes up short, with

7 Circus Circus largely repeating that it needed to temporarily shutter;[35] asserting that the

8 pandemic and this closure qualify under the policy;[36] and intoning the conclusory mantra that it

9 "experienced direct 'physical damage' to its property because of COVID-19," without explaining

10 what constitutes that direct, physical damage.[37]  Even the few instances where Circus Circus

11 purports to identify the property damage it suffered—noting that its employees have taken ill and

12 implying, but not quite stating, that its "objects and surfaces" were "contaminat[ed]" by COVID-

13

14

---

15 [33] *Emerald Coast Rests., Inc. v. Aspen Specialty Ins. Co.*, No. 20-cv-5898, 2020 WL 7889061, at
*2 (N.D. Fla. Dec. 18, 2020); *Carrot Love, LLC v. Aspen Specialty Ins. Co.*, No. 20-23586-Civ,
16 2021 WL 124416, at *2 (S.D. Fla. Jan. 13, 2021) (noting the "nearly unanimous view that
COVID-19 does not cause direct physical loss or damage to a property sufficient to trigger
17 coverage under the policy at issue here") (collecting cases); *Johnson v. Hartford Fin. Servs.
Grp., Inc.*, No. 1:20-cv-02000, 2021 WL 37573, at *5 (N.D. Ga. Jan. 4, 2021) ("Plaintiffs do not
18 allege any tangible alteration to a single physical edifice or piece of equipment [that] the
COVID-19 virus caused."); *10E, LLC v. Travelers Indem. Co of Conn.*, No. 2:20-cv-04418, 2020
19 WL 6749361, at *2 (C.D. Cal. Nov. 13, 2020); *Levy Ad Grp., Inc. v. The Chubb Corp. dba
Chubb Grp. of Ins. Cos.*, No. 2:20-cv-00763 (D. Nev. Feb. 16, 2021).  Because I am well
20 acquainted with the national precedent discussing COVID-19 insurance coverage and AIG does
not prevent controlling authority in its motion, I need not and do not refer to AIG's second
21 motion for leave to file supplemental authority, ECF No. 54, and thus deny it.

[34] ECF No. 26 at 6 (citing ECF No. 1, ¶¶ 40, 41, 43, 44, 49–55, 100, 101, 111–13, 123, 124).
22
[35] ECF No. 1, ¶¶ 40, 43, 44.
23 [36] *Id.* at ¶¶ 49–52, 55, 100, 111–13, 123.

[37] *Id.* at ¶¶ 54, 101, 124.

7

19[38]—its efforts still fail to allege a physical alteration.  Circus Circus's own pleadings indicate that, while the pandemic is ongoing, any alleged surface-contamination is ephemeral—the virus is only detectable on surfaces for "up to three days."[39]  And Circus Circus makes it clear that it temporarily shut down not because COVID-19 damaged its or its neighbors' property, but because it was ordered to do so by the governor.[40]  The casino also fails to allege any actual, physical change to its property requiring remediation.  The paucity of these allegations is hardly sufficient to show the type of distinct, demonstrable, physical alteration or change in the condition of the property needed to show "direct physical loss or damage."

Nor am I persuaded by Circus Circus's second argument that "direct physical loss" reasonably encompasses temporary "loss of use."  This claim, which hinges on the disjunctive tense in the clause "direct physical loss or damage," finds no basis in the plain language of the provision, which requires the plaintiff to allege a permanent "loss" or dispossession from the property.  Circus Circus has alleged nothing of the sort, admitting that it reopened its doors a few months after the governor's closure orders.[41]  Multiple courts have reasoned similarly, dismissing identical arguments and allegations because they are insufficient to show direct physical loss or damage.  In *Protégé Restaurant Partners LLC v. Sentinel Insurance Company, Ltd.*, for example, a California district-court judge recited numerous cases dismissing claims similar to the casino's, reasoning that "[w]here a policy additionally requires 'direct physical loss

---

[38] *Id.* at ¶ 54 ("Circus Circus has also experienced direct 'physical damage' to its property because of COVID-19.  COVID-19 also causes physical damage to property because it contaminates objects and surfaces as described above.").

[39] *Id.* at ¶ 26; ECF No. 26 at 17.

[40] ECF No. 1, ¶¶ 40–43 (noting that people infected with COVID-19 were on the property prior to its close, which occurred within one minute of the governor's mandate).

[41] ECF No. 26 at 17.

of or physical damage to property,' there must either be a physical change in the condition or a permanent dispossession of the property."[42]   In *Selane Products, Inc. v. Continental Casualty Co.*, another district-court judge reasoned that even though COVID-19 "can adhere to surfaces of property for several days," such allegations still fail to show "a distinct, demonstrable, physical alteration."[43]   So too in *Mortar and Pestle Corp. v. Atain Specialty Insurance Co.*, where another judge held that the "physical presence of the virus," which has "intruded upon the property" and infected individuals," does not "plausibly allege coverage" under a policy insuring against "direct physical loss or damage."[44]   And in *Unmasked Management, Inc. v. Century-National Insurance Co.*, a fourth judge reasoned that "the alleged presence of COVID-19 in or on the covered property," or allegations that "at least one of [its] employees tested positive for COVID-19," were insufficient to warrant coverage under a "direct physical loss or damage" insurance policy.[45]   I find their reasoning persuasive and join them.

Circus Circus's reliance on non-binding cases like *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Insurance Co.*,[46] *Studio 417, Inc. v. The Cincinnati Insurance Co.*,[47] or *Meridian*

---

[42] *Protégé Rest. Partners LLC v. Sentinel Ins. Co., Ltd.*, No. 20-cv-03674, 2021 WL 428653, at *4 (N.D. Cal. Feb. 8, 2021).

[43] *Selane Prods., Inc. v. Cont'l Cas. Co.*, -- F. Supp. 3d --, 2020 WL 7253378, *4 (C.D. Cal. 2020) (internal quotation marks and citations omitted).

[44] *Mortar and Pestle Corp. v. Atain Specialty Ins. Co.*, -- F. Supp. 3d --, 2020 WL 7495180, at *4 (N.D. Cal. 2020) (internal quotation marks and citations omitted).

[45] *Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*, No. 3:20-cv-01129, 2021 WL 242979, at *6 (S.D. Cal. Jan. 22, 2021).

[46] *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*, No., A-20-816628-B, 2020 WL 7190023 at *2 (D. Ct. Nev. Nov. 30, 2020).

[47] *Studio 417, Inc. v. The Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 795 (W.D. Mo. 2020).

*Textiles, Inc. v. Indemnity Insurance Co. of North America*[48] does not alter this result. *JGB Vegas Retail Lessee* is an unpublished, trial-court opinion decided under Nevada Rule of Civil Procedure 12(b)(5), which articulates a lenient "notice" pleading standard that has been abandoned by the federal courts.[49]   *Meridian Textiles, Inc.* merely held that when an object, like yarn, is damaged by an intangible material so as to require a form of remediation affecting the quality of the yarn itself, a plaintiff may be able to show physical damage or loss.[50]  No similar injury has occurred here.  And while *Studio 417, Inc.* superficially supports Circus Circus's position, it is a heavily criticized, out-of-circuit opinion that is explicitly at odds with decisions in the Ninth Circuit and California,[51] which Nevada courts often rely upon for guidance.  And unlike the *Sudio 417, Inc.* plaintiff, Circus Circus fails to allege that any actual, physical damage to its casino or its neighbors' property caused it to close or directly caused the governor to order its closure.[52]  Because these cases are not on the nose, I find that Circus Circus has not alleged sufficient physical loss or damage sufficient to trigger its policy's coverage.

**B.     Circus Circus's policy excludes its losses.**

Even were I to find that Circus Circus had alleged physical damage to its property covered by the policy, the pollutants-or-contaminants exclusion would preclude coverage.  To prove that an exclusion prevents coverage under a policy, the insurer must (1) "write the exclusion in obvious and unambiguous language," (2) show that the insurer's proposed

---

[48] *Meridian Textiles, Inc. v. Indem. Ins. Co. of N.A.*, No. CV 06-4766, 2008 WL 3009889, at *6 (C.D. Cal. Mar. 20, 2008).

[49] *JGB Vegas Retail Lessee, LLC*, 2020 WL 7190023 at *2.

[50] *Meridian Textiles, Inc.*, 2008 WL 3009889 at *6.

[51] *Studio 417, Inc.*, 478 F. Supp. 3d at 801; *see Protégé Rest. Partners LLC*, 2021 WL 428653 at *5.

[52] *See Protégé Rest. Partners*, 2021 WL 428653 at *5.

interpretation is the only fair interpretation of the exclusion, and (3) show that the exclusion clearly applies to the claim at hand.[53]  Under the terms of the policy, AIG does not provide coverage for the "release, discharge, escape, or dispersal" of pollutants or contaminants, which are defined to include "any solid, liquid, gaseous, or thermal irritant or contaminant," "which after its release can cause or threaten damage to human health or welfare," "including, but not limited to, bacteria, virus, or hazardous substances."[54]  Circus Circus argues that this exclusion does not apply to COVID-19 because (1) the clause is ambiguous and subject to multiple, reasonable interpretations; and (2) the complaint contains no allegations about COVID-19's dispersal.[55]

In *Century Surety Co. v. Casino West, Inc.*, the Nevada Supreme Court had the chance to interpret a similar clause, reasoning that it was ambiguous as to whether the clause excluded damage caused by carbon monoxide.[56]  Noting that the clause could be construed as one applying to "traditional environmental pollution" or a broader set of "pollutants," that Court certified that the exclusion did not necessarily apply to claims stemming from carbon monoxide poisoning.[57]  But that decision, which imposed broad coverage for a third-party policy that limited liability for traditional pollutants,[58] is of limited help here because I must interpret a first-person policy broadly limiting liability for health-harming contaminants *and* environmental

---

[53] *Big-D Const. Corp. v. Take it for Granite Too*, 917 F. Supp. 2d 1096, 1113 (D. Nev. 2013) (quoting *Powell v. Liberty Mut. Fire Ins. Co.*, 252 P.3d 668, 673 (Nev. 2011) (internal quotation marks omitted)).

[54] ECF No. 2-1 at 20, 49.

[55] ECF No. 26 at 20–21.

[56] *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014).

[57] *Id.* at 617.

[58] *Id.*

11

pollutants.  Thus, I must determine whether the virus that causes COVID-19 falls within the definition of a "virus" that has been "releas[ed]" dispers[ed]," or "discharg[ed]," or has "escape[d]," causing damage to health and human welfare.

I find that the SARS-CoV-2 virus and resulting COVID-19 pandemic falls squarely within the policy's pollutants-or-contaminants exclusion.  Circus Circus cannot reasonably claim that SARS-CoV-2 is not a virus.[59]  Its own pleadings support a finding that the virus has been released, dispersed, and discharged into the atmosphere, resulting in infections and transmissions.[60]  And Circus Circus also contorts the clear language of the policy when it argues that the exclusion requires the virus to have been released from solid waste,[61] improperly deleting an intermediary clause in order to support its reading.  Such efforts are unpersuasive and have been rejected by courts before me.[62]  So I also find that Circus Circus could not expect coverage under this policy for damages caused by the COVID-19 pandemic.

---

[59] ECF No. 26 at 22.

[60] *See, e.g.*, ECF No. 1 at ¶¶ 24 n.5 (citing WHO, *Coronavirus Disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020) ("Data from published epidemiology and virologic studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.")); 25 ("COVID-19 [is] spready by human-to-human transfer . . . ."); 25 n.6 (citing WHO, *Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations* (Mar. 29, 2020) (noting that COVID-19 is often spread through aerosols and droplets, dispersed through the air by acts like breathing, coughing, or sneezing)); *see also* ECF No. 23 at 5 n.3.

[61] ECF No. 26 at 22 n.19.

[62] *See, e.g.*, *Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F. Supp. 3d 353, 358 (W.D. Tex. 2020).

1    **II.      Motion for leave to amend [ECF No. 62]**

2            Rule 15(a)(2) of the Federal Rules of Civil Procedure directs that "[t]he court should

3    freely give leave when justice so requires."[63]  But when a party moves to amend after the

4    deadlines set in the court's scheduling order, the party must first show "good cause" to do so

5    under Rule 16.[64]  Once good cause has been established, district courts consider five factors to

6    determine whether to grant leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the

7    opposing party, (4) futility of amendment, and (5) whether the plaintiff has previously amended

8    the complaint.[65]  "Futility alone can justify the denial of a motion to amend."[66]

9            **A.       Good cause exists to permit amendment.**

10           Rule 16's good-cause standard "primarily considers the diligence of the party seeking the

11   amendment.'"[67]  Circus Circus argues that its request to amend after the deadline was not

12   prompted by a lack of diligence, but because discovery revealed new facts that would support its

13   (as-yet unpled) claims for breach of the implied covenant of good faith and fair dealing and NRS

14   §§ 686A.310(1)(c), (e).  While AIG is correct that some of these facts were available to Circus

15   Circus at the beginning of this litigation,[68] many critical facts were not available until it received

16   AIG's discovery responses in December 2020—particularly those facts that support its assertion

17

18   _____

19   [63] *Carrico v. City & Cnty of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011).

     [64] *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

20   [65] *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (internal citation omitted).

21   [66] *Id.* (internal citation omitted).

22   [67] *Mammoth Recreations, Inc.*, 975 F.2d at 609; *Neidermeyer v. Caldwell*, 718 F. App'x. 485, 488 (9th Cir. 2017) (unpublished).

23   [68] For example, Circus Circus was well-aware of the limited scope of AIG's insurance adjuster's questions when those questions were initially posed.  *See* ECF No. 62 at 4 (reciting April 1, 2020, questions).

that AIG unduly delayed in investigating and adjudicating the casino's coverage claim.[69]  Other district courts have granted plaintiffs leave to amend in similar circumstances.[70]  Like the plaintiffs in those cases, Circus Circus could not have been aware of these "behind-the-scenes" facts until December 2020, so I find that Circus Circus's belated amendment request is not due to a lack of diligence and that it has established good cause for amendment.

## B. The factors weigh in favor of amendment.

When "good cause" has been established under Rule 16, courts examine whether amendment is proper under the standards outlined in Rule 15(a).  The Ninth Circuit has repeatedly affirmed that there is a strong public policy in favor of permitting amendment.[71]  Conceding that Circus Circus has not sought to amend its complaint before, AIG focuses on the futility, propriety, and prejudice of amendment, arguing that (1) Circus Circus cannot succeed on its claims as a matter of law; (2) amendment will disrupt the parties' discovery schedule, causing undue prejudice; and (3) bad faith motivates Circus Circus's unduly delayed amendment.

### 1. *Amendment to add an NRS 686A.310(1)(c) claim is not futile.*

AIG argues that amendment would be futile because Circus Circus's breach-of-contract, declaratory-judgment, proposed breach-of-the-implied-covenant, and proposed NRS 686A.310(1)(c), (e) claims fail as a matter of law.  With respect to the breach-of-contract claim

---

[69] *E.g.*, ECF No. 62 at 8 (describing discovery responses indicating that AIG told its claims adjuster to "sit tight" and do nothing, while it determined whether to provide coverage).

[70] *Drummer v. Alpha Team Constr.*, No. 2:18-cv-01251, 2019 WL 2518446, at *2 (D. Nev. Jun. 17, 2019) ("Here, Plaintiff did not obtain the relevant information concerning employment document until May 13, 2019 . . . .  Accordingly, the Court finds that, in the circumstances of this case, Plaintiff has been diligent."); *Zambrano v. Cardenas Mkts., Inc.*, No. 2:16-cv-01659, 2016 WL 7045710, at 2 (D. Nev. Dec. 2, 2016) (permitting untimely amendment when new documents unearthed additional, key facts).

[71] *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

and declaratory-judgment request, I agree that amendment would be futile; Circus Circus cannot

allege facts that would escape the policy's pollutant-or-contaminant exclusion, much less allege

facts showing that the virus caused direct physical loss or damage to its property.  Amendment

would also be futile to add Circus Circus's implied-covenant and NRS 686A.310(1)(e) claims.

Under Nevada law, both causes of action require a plaintiff to demonstrate that an insurer refused

to provide coverage "without proper cause to compensate its insured for a loss covered by the

policy."[72]  To constitute a denial "without proper cause" an insurer must have an "actual or

implied awareness of the absence of a reasonable basis for denying benefits of the policy."[73]

Here, AIG had a reasonable basis to deny Circus Circus coverage—a basis that has only been

confirmed by my ruling on AIG's Rule 12(b)(6) motion.[74]  So I find that amendment would be

futile, and deny Circus Circus's motion with respect to its breach-of-contract, NRS

686A.310(1)(e), and breach-of-the-implied-covenant claims, as well as its request for declaratory

judgment.

       But amendment is not futile with respect to Circus Circus's NRS 686A.310(1)(c) claim.

Under that section of the unfair-claims statute, it is an unfair practice to "fail[] to adopt and

---

[72] *United States Fidelity & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975); *see also* Nev. Rev. Stat. § 686A.310(1)(e) ("Engaging in any of the following activities is considered to be an unfair practice: [] Failing to effectuate prompt, fair[,] and equitable settlements of claims in which liability of the insurer has become reasonably clear.").

[73] *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354 (Nev. 1986) (internal citations omitted).

[74] *Tenzer ex rel. A.T. v. Minn. Life Ins. Co.*, 826 F. App'x. 654, 655 (9th Cir. 2020) (unpublished) (upholding district court's denial of bad-faith-breach claim because "there can be no finding of bad faith" when "an insurer is legally entitled to rescind a policy"); *see also Sherwin v. Infinity Auto Ins. Co.*, No. 2:11-cv-00043, 2013 WL 5918312, at *3 (D. Nev. Oct. 31, 2013) ("The key to a bad faith claim is whether or not denial of the coverage was reasonable."), *aff'd*, 639 F. App'x. 466 (9th Cir. 2016); *CP Food & Beverage, Inc. v. United States Fire Ins. Co.*, 324 F. Supp. 3d 1172, 1178 (D. Nev. 2018) ("[I]f the insurer had a reasonable basis for its decision, there can be no finding of bad faith as a matter of law.").

implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies."[75]   And an "insurer is liable to its insured for any damages sustained by the insured as a result of the commission of any act [identified in § 686A.310(1)] as an unfair practice."[76]   In its proposed amended complaint, Circus Circus has alleged sufficient facts to show that AIG failed to implement a reasonable process for promptly resolving its coverage claim, using an unlicensed claims adjuster who asked limited questions and unreasonably delayed resolution of Circus Circus's claim.[77]   And while AIG disputes whether Circus Circus was actually damaged by the alleged absence of this process,[78] that factual issue cannot be resolved on a Rule 12(b)(6) motion.   So I find that amendment would not be futile with respect to Circus Circus's NRS 686A.310(1)(c) claim.

### 2.   *The remaining factors permit amendment.*

Because I find that Circus Circus predicated its amendment request on facts it only recently learned in the discovery process, I find that its amendment was not motivated by bad faith or the result of undue delay.   But I am sympathetic to AIG's concerns that it will be prejudiced by Circus Circus's belated filing, particularly with respect to any discovery needed to dispute the casino's new NRS 686A.310(1)(c) claim and alleged damages.[79]   This potential prejudice could, however, be remedied by an extension of the discovery period beyond May 14, 2021, and need not necessarily stand in the way of permitting amendment.   So I grant Circus Circus's motion for leave to amend in order to add its NRS 686A.310(1)(c) claim.

---

[75] Nev. Rev. Stat. § 686A.310(1)(c).

[76] *Id.* § 686A.310(2).

[77] ECF No. 62-1, ¶¶ 92–102.

[78] ECF No. 67 at 12–13.

[79] *Id.* at 6–10.

**Conclusion**

IT IS THEREFORE ORDERED that AIG's motion to dismiss **[ECF No. 17] is GRANTED.**  Circus Circus's claims for declaratory judgment and breach of contract are **DISMISSED WITH PREJUDICE.**

IT IS FURTHER ORDERED that AIG's motion for leave to file supplemental authority **[ECF No. 54] is DENIED.**

IT IS FURTHER ORDERED that Circus Circus's motion for leave to amend **[ECF No. 62] is GRANTED**.  Plaintiff is directed to file its first amended complaint alleging its single, remaining cause of action for violations of NRS 686A.310(1)(c) by March 12, 2021.  If it fails to do so, this case will be dismissed with prejudice.

_____

U.S. District Judge Jennifer A. Dorsey
Dated: February 26, 2021